John and Betty M. Chanik v. Commissioner.
Chanik v. Commissioner
Docket Nos. 3066-68, 4163-69.
United States Tax Court
T.C. Memo 1972-174; 1972 Tax Ct. Memo LEXIS 80; 31 T.C.M. (CCH) 851; T.C.M. (RIA) 72174; 43 Oil & Gas Rep. 447; August 16, 1972, Filed. Donald G. Schiff, 1800 W. 8 Mile Rd., Southfield, Mich., for the petitioners. John H. Menzel, for the respondent. H. Menzel, for the respondent. STERRETT
Memorandum Findings of Fact and Opinion STERRETT, Judge: Respondent has asserted deficiencies and penalties with respect to petitioners' Federal income taxes for the years and in the amounts indicated: Addition to Tax
Addition to Tax
Year
Tax
Under Sec. 6653(a) [1]
Under Sec. 6653(b)
1958
$ 3,978.46
$ 1,989.23
1959
69,432.16
34,716.08
1960
13,782.39
6,891.20
1961
14,019.19
$700.96
1964
3,024.94
151.25
1965
2,618.89
130.95
*82 The present cases present a number of questions for determination, to wit: 1. Whether amounts received by petitioners from investors in each of the years 1958 through 1961 with respect to fractional interests in certain oil leases constituted income and, whether the proceeds of additional assessments collected from the investors during the same years also constituted income. 2. Whether respondent correctly determined the amount of losses or taxable income realized by petitioners from certain oil leases in each of the years in issue. 3. Whether petitioners incurred deductible business expenses in connection with exploration for oil and formation of joint ventures in the years 1958, 1959, 1964, and 1965. 4. Whether any part, if any, of the underpayment for each of the years 1961, 1964, and 1965 was due to negligence or intentional disregard of rules and regulations so that the addition provided by section 6653(a) applies. 853 5. Whether any part of the underpayments, if any, for each of the years 1958, 1959, and 1960 was due to fraud thereby invoking the penalty under *83 section 6653(b). 6. Whether any of the years 1958 thru 1961 is closed to the assessment and collection of taxes. 7. Whether the petitioner Betty Chanik, having filed a joint return with her husband, is nonetheless relieved of liability for taxes for any of the years in issue. Findings of Fact Some of the facts have been stipulated and are so found. John Chanik and Betty Chanik (hereinafter respectively referred to as John and Betty) are husband and wife, and at the time of filing their petitions herein resided in Birmingham, Michigan. They filed joint Federal income tax returns with the district director of internal revenue, Detroit, Michigan, for each of the years 1958 through 1961, 1964 and 1965. John has a Bachelor of Science, Mechanical Engineering degree, as well as a Bachelor of Mechanical Engineering degree, and has completed at least 15 hours work on a Master of Mechanical Engineering degree. For some time prior to the years in issue John had been interested in oil and gas leases in Oklahoma, and had purchased and sold interests in several oil and gas leases. On Labor Day weekend, 1958, John met with William R. Reilly, Jr. who was a crude oil producer (hereinafter *84 referred to as Reilly) of Bartlesville, Oklahoma, and agreed to buy an oil lease located in Osage County, Oklahoma (hereinafter referred to as the Osage lease). Reilly and John reduced their agreement to a contract executed September 26, 1958. The purchase price for the Osage lease was $22,500 of which $4,000 had been paid. The balance of $18,500 was payable in five installments, without interest, the last installment being due on February 1, 1959. At the time of purchase, the Osage lease had five producing oil wells and one salt water disposal well on it. It also had two 100 barrell sealed stock tanks, one 40 gallon sealed gunbarrel type separator with accessories, catwalks (which are elevated walkways connecting the tank batteries), fences and a triplex pump driven by an electric motor to dispose of the salt water. All this equipment was conveyed to John as part of the lease acquisition transaction. On December 30, 1958, John bought another lease in Osage County from Reilly. This was known as the Barnsdall lease. The purchase price of $22,500 was to be paid in a series of cash installments with the last cash installment due on March 1, 1959, at which time a note for $6,250 was *85 to be executed. The note was to be payable in 24 equal monthly installments beginning April 1, 1959. At the time of purchase, the Barnsdall lease had four producing oil wells. It was equipped with two 100 barrel stock tanks, a steel type gunbarrel separator, an additional stock tank and catwalks. There was also located on the lease a dwelling house and a metal pumphouse with two engines in it. All this equipment was conveyed with the lease. In an agreement dated March 14, 1959, Reilly conveyed to John seven additional leases in the Bartlesville, Oklahoma, area. These leases were known as the Holland, Perkins, Schuermeyer, Todd, Walker, Henry, and Reedy leases. These leases were later unified for operations and known as the West Copan Unit. The agreement provided for a total purchase price of $75,000 for the seven leases as a group. The purchase price was payable $3,750 upon signing the contract; $3,750 on April 1, 1959; $7,500 on May 1, 1959; and $15,000 on June 1, 1959, at which time the Holland lease would be assigned to the buyer; $15,000 on July 1, 1959, when the Reedy lease would be assigned; $10,000 on August 1, 1959, when the Todd lease was to be assigned; and $10,000 on September 1, 1959, when *86 the remaining four leases were to be assigned. Then John was to execute a promissory note for the remaining balance of $10,000. Payments of $250 on this note, plus interest, were to be made each month beginning October 1, 1959, until September 1, 1960, when the remaining balance was required to be paid. At the time Reilly sold the seven leases to John, there were the following wells located thereon: Four producing oil wells and one salt water disposal well on the Holland lease; five producing oil wells on the Reedy lease; and one producing well on the Todd lease. The Holland lease had two 100 barrel steel stock tanks, a 40 barrel steel gunbarrel type separator, catwalks, fences and a triplex pump for the disposal pump driven by an electric motor, and also a small shed. The Reedy lease had two 100 barrel steel stock tanks, a 35 or 40 barrel gunbarrel type separator, catwalks and a small shed which Reilly did not use in operating the oil lease. 854 Subsequent to the purchase of the oil leases, John offered fractional interests in the leases to various interested parties. The transfer of the fractional interests to the investors was effected by written assignment. The assignments *87 were filed or recorded with the relevant local agency or government in Oklahoma. An operating agreement was entered into between each investor and John, designating John as the operator of the lease in question. Under the operating agreement John retained exclusive management and control over the development and operation of the leases. The agreement recites that John and the signing investor were joint owners of the lease, and that the agreement was not to be construed so as to create a partnership. It was provided in the agreement that investors were to have access to the books and records of the particular lease. The investors were obligated to pay, in proportion to their interests, the expenses of operating the leases. John, as operator, was permitted to assess the investors on the basis of estimated expenses, any excess over actual expenses was to be returned. Portions of the Osage lease were sold by John for a price of $500 for each 1/128 fractional interest. The initial price for a 1/128 fractional share of the Barnsdall lease was $625; this was later increased to $1,000. Interests in the Holland, Reedy, and Todd leases were sold for $1,250 per 1/128 fractional share. *88 The total amounts of fractional interests in the various leases sold by John, the interests retained by him, and the total amounts of money received for the interests in each lease are as follows: Interests
Interest Retained
Proceeds
Lease
Sold
as of 12/31
Received
1958
Osage
37/128
91/128(.7109375)
$18,500.00
1959
Barnsdall
56/128
72/128(.5625)
$39,770.00
Holland
49/128
79/128(.6171875)
61,250.00
Reedy
46/128
82/128(.640625)
56,500.00
Todd
4/128
124/128(.96875)
5,000.00
1960
Todd
8/128
116/128(.90625)
$10,000.00
Twenty 1/128 shares in the Reedy lease were sold after September 15, 1959, for an aggregate gross amount of $26,000. Subsequent to the sale of the fractional interests, cash distributions were made to the investors by John. John also billed or assessed the individual investors for additional money. The total amounts distributed to and collected from the investors by John for each of the oil leases during the years 1958 through 1961 are as follows: Receipts
from
Lease
Distributions
Assessments
1958
Osage
$ 609.46
$ 0
1959
Osage
$7,603.50
$11,562.50
Barnsdall
2,422.00
0
Holland
3,895.00
0
Reedy
1,677.50
0
Todd
40.00
0
1960
Osage
$6,604.50
$ 5,550.00
Barnsdall
3,035.00
11,687.50
1960
Holland
4,777.50
7,962.50
Reedy
3,870.00
7,475.00
Todd
1,290.00
0
1961
Osage
$ 555.00
$ 9,620.00
Barnsdall
715.00
3,417.50
Holland
808.50
8,085.00
Reedy
588.00
6,930.00
Todd
306.00
1,980.00
*89 When exercising his authority under the operating agreement to make assessments, John did not bill or assess the investors for each well drilled as it was drilled, nor did he advise the investors when such wells were drilled. John engaged Norman Walker (hereinafter referred to as Walker) to perform accounting and bookkeeping services for the lease ventures. Walker prepared partnership income tax returns for each of the leases in each of the years 1958 through 1961. He also maintained ledger books for each of the oil leases. Each ledger contained a general journal, a cash receipts journal, a cash disbursements journal, a capital account for each investor, asset accounts, and expense accounts, including a drilling expense account. Walker died in June, 1963. When John started selling fractional interests in a lease, he opened a checking account under the name of the lease at the Uptown Branch of the National Bank of Detroit. Each investor would be given a receipt by John and John kept a book of duplicate receipts. Duplicates of deposit tickets for each account were also kept by John. Walker would receive from John, with respect to each lease, the duplicate receipt book, the duplicate *90 deposit slip book, cancelled checks, bank statements, and a list of participants in the lease. This information was then used by Walker to make entries in the ledger book of each lease. The partnership returns filed for each lease were prepared by Walker based upon information recorded in the lease ledgers. The investors usually paid the initial amount and the later assessments by personal check. These checks were usually negotiated at the Uptown Branch of the National Bank of Detroit one or more days before the date under which amounts of the checks and the names of the makers were recorded on the cash receipts journal and the deposit slips of the relevant lease. During the years 1958 through 1961, John purchased numerous cashier's checks from the Uptown Branch of the National Bank of Detroit. These checks were made payable to John and were usually endorsed by him and negotiated or deposited at the Uptown Branch within a day or so after being purchased. Sometimes cashier's checks would be used to purchase new cashier's checks. John informed Walker that the amounts of the cashier's checks represented the purchase of equipment and drilling services for the various leases. Typically *91 John would supply Walker with the dates and amounts of a group of cashier's checks and this information would be recorded as a general journal entry on the ledger of one of the leases. The aggregate dollar amount of the group of checks would be entered as a capital contribution to the lease venture from John. Then, by book entries, the amount would be divided between equipment and drilling expenses. The amount assigned to equipment would be so reflected in the partnership return prepared for that lease. The amount allocated to drilling expenses would be reflected as a current expense in the partnership return for the particular lease for the year in which the relevant group of cashier's checks was purchased. The books and records in evidence of the named lease for the year indicated show the following amounts as John's contributions resulting from drilling expenses paid for by cashier's checks: Year
Lease
Amount
1958
Osage
$ 70,940.85
1959
Barnsdall
29,500.00
1959
Holland
98,750.00
1959
Reedy
102,500.00
1960
Osage
26,350.00
1960
Barnsdall
15,512.50
1960
Holland
12,837.50
1960
Reedy
13,325.00
1961
Holland
1,777.00 The ledger book for *92 the Todd lease was not placed in evidence. The cashier's checks applicable to Osage in 1958 were purchased starting March 28, 1958. The books of the Holland lease show payments of drilling expenses by cashier's checks in 1959 starting February 3 and ending May 6, 1959. The cashier's checks applicable to Reedy in 1959 were purchased between May 4 and July 27 of that year. All the cashier's checks purported to show John's payment of drilling expenses for the Barnsdall lease were acquired between January 14 and 23, 1959. Some of the funds used to obtain the leases were acquired from the First National Bank of Dewey, Oklahoma. Payments on the amounts owed the First National Bank of Dewey were made monthly throughout 1959, 1960 and 1961. The amounts of checks drawn on the lease accounts to the favor of the First National Bank of Dewey were charged to drilling expenses on the books of the leases. During the years 1959, 1960 and 1961 a number of checks were drawn on the lease accounts to the favor of the National Bank of Detroit. These checks were negotiated at the Detroit National Bank by John. Upon information supplied by John, Walker charged the amounts of the checks to drilling *93 expenses on the books of the leases. Also during the years 1959 through 1961 a number of checks to the order of Reilly were written against the lease accounts. The amounts of these checks were shown on the books of the leases as drilling expenses. Four checks made out to Reilly in 1959 were never received by him, nor were the proceeds. Rather, John first signed 856 Reilly's name on the checks, then endorsed the checks with his own name, and finally negotiated them at the Detroit National Bank. John did not have Reilly's authorization to sign Reilly's name on the checks. During the years 1958, 1959, and until about August 1960, Betty was employed by General Motors Corporation. She worked in the General Motors Building, Detroit, Michigan. The Uptown Branch of the National Bank of Detroit was located on the first floor of that same building. Almost all the checks received in payment for the fractional interests in the leases and the assessments were taken to the Uptown Branch by Betty and negotiated there. During the period she worked for General Motors, Betty made almost all the deposits to the lease accounts at the Uptown Branch and also purchased there almost all the cashier's *94 checks which petitioners claim represented drilling expenses paid by John. Betty attended some of the meetings John held with investors, and did typing and similar chores with respect to the lease activities. When John purchased the group of seven leases (including Holland, Reedy and Todd) in the area of Bartlesville, Oklahoma, he intended to produce oil by water flooding. The oil field in Bartlesville area is an old field which was first drilled many years ago and the gas pressure that drove the oil out of the producing sands had been depleted. Water flooding was being used as a means of producing from the field again. None of the leases acquired by John was being water flooded at the time he purchased them. John ordered an evaluation of a possible Orco process water flood from the Oil Recovery Corporation, Tulsa, Oklahoma. The report was completed on February 15, 1962, although interim information had been supplied as early as 1958. The Orco process was never used. Subsequent to the purchase of the leases involved in the present proceeding, John had wells drilled on the property covered by the leases. Records placed in evidence show that John undertook to have the following wells *95 drilled during the years in issue: Well
Work
Work
Type of Well
Lease
No.
Started
Completed
Oil
Osage
10
12/ 4/58
12/11/58
Oil
Osage
11
1/25/59
1/31/59
Oil
Osage
12
11/23/59
12/ 4/59
Abandoned
Barnsdall
10
* 3/ /59
* 3/ 9
Converted to Salt
Barnsdall
11
3/ 7/59
3/12/59
Water Disposal
Oil
Barnsdall
16
2/ 6/59
2/19/59
Oil
Barnsdall
17
8/13/60
9/ 9/60
Converted to Water
Holland
6
6/ 0/59
6/30/59
Injection
Oil
Holland
8
5/21/59
5/27/59
Water Injection
Holland
9
6/ 1/59
6/ 8/59
Water Injection
Holland
10
6/ 9/59
6/18/59
Water Supply
Holland
11
6/19/59
6/24/59
Water Supply
Holland
12
6/25/59
6/27/59
Oil
Reedy
11
9/24/59
10/ 5/59
Water Injection
Reedy
12
10/ 7/59
10/17/59
Water Injection
Reedy
13
10/20/59
10/30/59
Water Injection
Reedy
14
11/ 2/59
11/12/59
Oil
Reedy
15
11/14/59
11/21/59
John and Reilly agreed at the time the various leases were purchased that Reilly would sit on the leases for John. By this it was meant Reilly would, in the capacity of an observer, see that the wells were drilled properly and to completion. *96 Reilly sat on every well drilled by John on the leases here in issue during the years 1958 and 1959. Included among the wells which Reilly sat on for John were two efforts described as "4-input-well pilot waterfloods," one each on the Holland and the Reedy leases. No water injection wells were drilled and no water flooding was ever undertaken on the Osage and the Barnsdall leases. The M. G. Jenson Drilling Co., owned and operated by M. G. Jenson, during 1958 and 1959 drilled at least 14 wells of various types for John and did substantial refurbishing work on two other wells which had been drilled years earlier. The well drilling and related services provided John by Jenson were initially procured by Reilly. It was not part of Jenson's duties to complete the oil, water or disposal wells to the production or utilization state. Jenson was 857 always paid for his work by checks drawn on the account of the appropriate lease. In early September 1960, one Alton L. White finished drilling a well on the Barnsdall lease. One check payable to White in the amount of $500 was drawn on the Barnsdall lease account in February 1961, and two additional checks aggregating $900 were drawn to *97 White's favor in March 1961. No checks were written to White's order on the Barnsdall account during 1960 or during the balance of 1961. The ledger books of the leases indicate numerous payments by check of amounts ranging from about $20 to about $1,300 to payees such as P & L Equipment, D.C: Machine and Welding, Haliburton Oil Well Cementing, Graves Supply Co., Keystone Supply Co., E.L. Key Oil Well Service, Ward Industrial Electric Co., Welex Inc., Alco Drilling Co., Inc., Nowata Pipe and Manufacturing Co., B & R Well Service, and Rig Cementing Co. The amounts of most of these checks were in the low hundreds. A check written to these payees was charged to either drilling expenses or to machinery and equipment on the books of the lease against the account of which the check was drawn. The ledger of the Barnsdall lease shows that one John W. Olsen, throughout 1959, 1960 and 1961, received at least one check each month drawn on the Barnsdall lease account usually in the amount of $49.25 during the 1959, and $49.10 in the later years. The amounts of the checks were charged in part to salary and wages and in part to travel expenses. Olsen is now dead. The Barnsdall ledger also reveals *98 two checks were written to the order of C. W. Gatton. One check was written in January 1959 for the amount of $857.75, and the other in March 1959 for the amount of $59.00. Both amounts were charged to drilling expenses. Gatton is now dead. Revenue agent Nathan Kelman (hereinafter referred to as Kelman) was assigned to examine John's Federal income tax returns for the years 1960 and 1961. In connection with that examination, he called John on or about September 1, 1962. John referred Kelman to Walker. Thereafter Kelman went to Walker's office where he saw the books and records of the various leases, including the Todd lease. Kelman questioned Walker about the journal entries showing John's capital investment in the leases and the drilling expenses which had been claimed. In search of back-up information for the journal entries, Kelman again called upon John. Kelman, on or about October 31, 1962, met with John at the latter's house. At the meeting John was asked for verification of drilling expenses in the amount of $96,704.75 claimed for the Todd lease. The greatest part of this claimed expense was represented by a journal entry crediting John's capital account with the amount of *99 $72,663.02 which John asserted he had spent from his own funds on drilling. When Kelman asked for substantiation of this item he was shown an invoice in an amount equal to the journal entry. The invoice was typewritten, and had a letterhead reading "M. G. Jenson Drilling Company." It was dated January 30, and purported to be related to Todd, No. 3 and Schuermeyer, No. 1 wells. The invoice shown by John to Kelman and purporting to be from the M. G. Jenson Drilling Company was not issued by that firm. Jenson never sent an invoice that large to John or anyone else. In a report dated June 26, 1967, Kelman described the receipt as fictitious. In 1963 John was investigated by the Michigan Securities and Exchange Commission which subpoenaed the books and records of the leases. When a Federal Grand Jury was considering mail fraud charges with respect to John, the U.S. Attorney obtained an undisclosed amount of books and records of the leases from the Michigan Securities and Exchange Commission. Almost all the evidence relied upon by the Commissioner in the present proceeding was obtained from the U.S. Attorney, and was among the lease records acquired by the U.S. Attorney from the Michigan *100 Securities and Exchange Commission. The Internal Revenue Service obtained accountant's work papers, and duplicate partnership returns from the Walker Accountant Service in 1966. The leases did produce and sell some oil during the years in issue. However, due to the size of the claimed deductions for drilling expenses and depreciation all leases, except Osage in 1959, showed substantial losses. John took deductions on his return for the losses in proportion to his retained interest in the particular lease. In joint Federal income tax returns for the years indicated petitioners, on Schedule C, "Profit (Or Loss) from Business or Profession," reported the following losses as having been incurred in the business of "Oil Exploration - forming Joint Ventures" 858 in 1958 and 1959, and "Oil Exploration" in 1964 and 1965: Year
Amount
1958
$2,618.87
1959
3,424.98
1964
1,950.28
1965
2,162.72 No income was reported on Schedule C for any of these years. Respondent in a statutory notice dated May 19, 1969, disallowed the business losses claimed by petitioners for 1958, and 1959 asserting that: [It] has not been established that you engaged in activities, described *101 as oil exploration and forming joint ventures which constitutes the carrying on of a trade or business, or, if you did, that the deductions comprising the losses claimed are ordinary and necessary business expenses. Respondent also included in petitioners' income the following amounts for the years indicated as unreported income realized on sales of interests in oil leases: Year
Amount
1958
$ 11,386.58
1959
140,313.92
1960
22,428.36
The oil lease venture losses claimed by petitioners in 1958, 1959 and 1960 were recomputed by respondent as follows: 859 Osage
02*Reedy
Holland
1958
1959
1960
1959
Ordinary income (loss)
($73,363.84)
$ 9,753.41
($ 1,751.58)
($93,645.78)
per Lease Return or books
Add: Unallowable
deductions
1. Drilling expenses
63,994.00
0
21,580.13
69,197.91
2. Depreciation
613.23
1,226.46
1,515.79
2,239.55
Ordinary income (loss)
( 8,756.61)
10,979.87
21,344.34
( 22,208.32)
revised
John Chanik's Interest
.7109375
.7109375
.7109375
.640625
John Chanik's Income
( 6,225.40)
7,806.00
15,174.49
(14,227.21)
(Loss)
Less: Depletion, 27-1/2 %
0
0
5,179.69
0
of Gross
50% of Net
0
3,903.00
0
0
Taxable income (loss)
($ 6,225.40)
$ 3,903.00
$ 9,994.80
($14,227.21)
Taxable income (loss)
( 52,157.08)
3,467.03
( 1,245.26)
( 59,991.83)
reported on petitioners'
return
Adjustment
$45,931.68
$ 435.97
$ 11,240.06
$45,764.62
*102 Barnsdall
Todd
1960
1959
1960
1959
Ordinary income (loss)
($ 8,072.82)
($96,589.56)
($ 6,640.42)
($45,636.12)
per Lease Return or books
Add: Unallowable
deductions
1. Drilling expenses
13,303.00
69,119.17
13,604.38
24,386.25
2. Depreciation
3,588.08
4,333.00
3,668.96
1,695.76
Ordinary income (loss)
8,818.26
( 23,137.39)
10,632.92
( 19,554.11)
revised
John Chanik's Interest
.640625
.6171875
.6171875
.5625
John Chanik's Income
5,649.20
( 14,280.11)
6,562.51
( 10,999.19)
(Loss)
Less: Depletion, 27-1/2 %
2,282.44
0
2,485.90
0
of Gross
50% of Net
0
0
0
0
Taxable income (loss)
$ 3,366.76
($14,280.11)
$ 4,076.61
($10,999.19)
Taxable income (loss)
( 5,171.61)
( 59,613.87)
( 4,098.33)
( 25,670.37)
reported on petitioners'
return
Adjustment
$ 8,538.37
$45,333.76
$ 8,174.94
$14,671.18
1960
1960
Ordinary income (loss)
($17,577.01)
($11,885.67)
per Lease Return or books
Add: Unallowable
deductions
1. Drilling expenses
16,187.50
3,229.10
2. Depreciation
1,668.51
0
Ordinary income (loss)
279.00
( 8,656.57)
revised
John Chanik's Interest
.5703125
.90625
John Chanik's Income
159.12
( 7,845.01)
(Loss)
Less: Depletion, 27-1/2 %
0
0
of Gross
50% of Net
79.56
0
Taxable income (loss)
$ 79.56
($ 7,845.01)
Taxable income (loss)
( 10,024.41)
( 10,771.38)
reported on petitioners'
return
Adjustment
$10,103.97
$ 2,926.37
*103 860 Fraud penalties were asserted for each of the y 860 Fraud penalties were asserted for each of the years 1958, 1959 and 1960. In a statutory notice dated April 11, 1968, respondent disallowed the business losses petitioners claimed for 1964 and 1965 for the asserted reason that petitioners had not established that deductible business losses had been sustained in either year. Petitioners' 1961 income was increased by the amount of $27,080 as unreported income realized on the sale of oil lease interests. Fully disallowed were the following amounts claimed in the year indicated by petitioners as oil lease venture losses: Year
Amount
1961
$129,254.91
1964
14,077.84
1965
15,778.93
Also asserted were negligence penalties for the years 1961, 1964 and 1965. At the time of trial respondent filed a motion to amend his answer to assert the fraud penalty for 1961. Opinion Prior to dealing with substantive matters we must first consider petitioners' motion to "Quash the Deficiency and Grant the Petition Because of Illegally Obtained Evidence." The books and records of the various leases, which constitute a substantial part of the evidence, were obtained *104 by respondent from the Michigan Corporation and Securities Commission via the U.S. Attorney. Petitioners contend the respondent acquired the records illegally because they were delivered in violation of Mich. Comp. Laws, section 451.806 (1948) which provides: (b) it is unlawful for the administrator or any of its officers or employees to use for personal benefit any information which is filed with or obtained by the administrator and which is not made public. No provision of this act authorizes the administrator or any of its officers or employees to disclose any such information except among themselves or when necessary or appropriate in a proceeding or investigation under this act. No provision of this act either creates or derogates from any privilege which exists at common law or otherwise when documentary or other evidence is sought under a subpoena directed to the administrator or any of its officers or employees. There is not sufficient evidence of record for us to determine how the U.S. Attorney obtained the records from the Commission. Even assuming, however, that a subpoena was required by Michigan law, but was not in fact used, and that the *105 records would thus constitute illegally obtained evidence, petitioners' contentions are nonetheless without merit. Each lease was governed by an operating agreement placing upon John the duty to develop the property for the joint benefit of all those with an interest in the particular lease. The operating agreement used for each lease gave each person having an interest access to the books and records of the particular venture. The books and records were maintained for the common benefit of all persons having an interest in the given lease. Under circumstances of this case, the evidence in question is not part of John Chanik's principal records. United States v. White, 322 U.S. 694, 699-670 (1944). Such being the case, John cannot invoke the Fourth Amendment and demand they be excluded. Suppression of evidence allegedly obtained in violation of the Fourth Amendment is available only to the party whose rights were violated and not by one inconvenienced or embarrassed solely by the introduction of the evidence gathered in violation of the constitutional rights of another. Alderman v. United States, 394 U.S. 165, 171-2 (1969). Specifically, the Supreme *106 Court in Alderman said at p. 174 "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." There being no personal right extant, we do not reach the question of whether illegally obtained evidence would be suppressed by this Court, or what remedy, if any, would be available to an aggrieved party. Efrain T. Suarez, et ux., 58 T.C. - (1972); Terry C. Rosano, 46 T.C. 681, 687 (1966). Accordingly petitioners' motion to suppress is hereby denied. Now we turn to the question of whether the initial amounts and later assessments received by John from the investors constituted income to John. During 1958, 1959 and 1960 John received money from investors on account of fractional interests in various leases. He also received during 1958 through 1961 additional money under the terms of an operating agreement. The agreement was executed by each investor with respect to each lease, and gave John the right to operate the given lease and assess investors for expenses in proportion to their respective interests. 861 Respondent contends that with the payments by the investors, John was in receipt of income. The *107 amount of gain allegedly realized on the transfer of an interest in a lease was determined by subtracting from the amount received the proportional cost of the interest sold in the particular lease. This result was then reduced by the amount of distributions made to the investor. The income allegedly resulting from the assessments was determined by subtracting distributions made to investors from the amount of the assessments. Petitioners assert that none of the payments are income because they represent investments in the leases by the investors. We do not fully agree with either party. When John initially received money from an investor with respect to a particular lease, the amount paid was always a fixed sum per 1/128 of the lease. With the receipt of the funds, John executed an assignment of one or more 1/128 interest in the particular lease. The assignment was recorded with the proper governmental agency. Upon the assignment the investor was entitled to a proportionate share of the income from the lease. An operating agreement executed at the time of the initial payment by the investors provided they were to pay a proportionate share of the expenses. It is readily apparent *108 that each investor assumed the benefits and burdens of, as well as title to, his fractional interest. Under these circumstances a sale has taken place for purposes of Federal tax law. Pacific Coast Music Jobbers, Inc., 55 T.C. 866, 874-5 (1971) affirmed 457 F. 2d 1165 (C.A. 5, 1972). The difference between the lease cost allocable to each transferred fractional interest and the amount at which the interest was sold constitutes taxable gain to John in the year in which the interest was sold. Petitioner asserts that all the initial funds received from the investors were deposited in lease bank accounts thus indicating that the funds were an investment to develop the leases. However the evidence shows that the acquisition costs of the leases were paid out of the respective lease bank accounts rather than John's personal funds. In the instance of each lease John retained a substantial fractional interest. Thus the difference between the original costs of a fractional interest and the amount paid for the interest by the investor was being used to pay for John's retained share. With the exception of part of the amounts received on the Reedy lease, the gain realized *109 by John on the sale of lease interests is taxable at ordinary rates. The Reedy lease was acquired on March 14, 1959. Twenty 1/128 fractional interests in that lease were sold after September 15, 1959, for a total amount of $26,000. The gain on these sales, having been realized more than 6 months after the acquisition of the lease, is taxable at capital gains rates. Section 1222(3). The assessments paid to John by the investors are a different matter. They were paid under terms of an operating agreement which clearly obligated John to utilize the assessed amounts for development and to return any amount not so used. It is undisputed that the assessments were deposited to the appropriate lease bank account. There is no allegation nor any evidence that John diverted the assessed funds to his own use and benefit. [2] See Rutkin v. United States, 343 U.S. 130, 137 (1952); accordingly we conclude that no part of the assessments collected by John constitutes income to him during the years in issue. Cf. Dawkins v. Commissioner, 238 F. 2d 174, 178 (C.A. 8, 1956).
*110 Next we turn to the question of whether respondent properly disallowed losses which petitioners claimed were generated by the operation of the lease. The losses reflect substantial drilling expenses and depreciation claimed in partnership returns filed for each lease. Petitioners took the losses on their return according to the proportion of John's retained interest in each lease. Petitioners' contention, in general, is that the questioned losses represent payments in cash, accounted for by ledger entries. Allegedly the cash payments, which were quite substantial for 1959-1961, were made in part to John W. Olsen and in part to C. W. Gatton. Petitioners would have us believe that the determination to charge the alleged payments to depreciable equipment and drilling expenses on the books of the leases was made by Norman Walker who kept books for the leases. By the time of the trial Gatton, Olsen and Walker, were all deceased. As has been well said in another context "From the voiceless lips of the unreplying dead there comes no word." [3] Thus petitioners would have done well to have brought forth direct, objective, 862 evidence to make real the shadowy presence of the three deceased *111 men. However the main evidence presented by petitioners was John's self-serving testimony. His testimony was frequently incomplete, unclear, and evasive. Further it was controverted by direct evidence and the testimony of disinterested witnesses. Under such circumstances we certainly are not obligated to lend great credence to John's testimony, and we do not. See, Schoenberg v. Commissioner, 302 F. 2d 416, 419 (C.A. 8, 1962), affirming a Memorandum Opinion of this Court. Part of the questionable drilling expense and depreciation deductions are represented by checks made out in 1959, 1960 and 1961 to William Reilly from whom John purchased the leases, and to the First National Bank of Dewey, Oklahoma, from which John borrowed funds to purchase leases. John admitted that these checks represented payments on the lease purchase agreement and the purchase loans. The purchase of a lease interest does not constitute a drilling expense. To be sure some equipment was acquired with the leases. Respondent has made an allowance for depreciation for 1959 and 1960, and petitioners have not shown us they were entitled to a greater amount. *112 Additionally, four of the checks drawn to Reilly's favor were never given to him. Rather, John endorsed them with Reilly's name. Then John signed his own name and cashed the checks at the Detroit National Bank. John maintains he did this to get cash with which to pay Gatton. We find no reason in the record to believe this explanation of his unusual behavior. A series of checks drawn in 1959, 1960 and 1961 on the lease accounts to the order of the National Bank of Detroit and negotiated at that bank by John are also alleged to be payments of drilling expenses. It is claimed the checks were cashed and the cash was paid to Gatton. No invoices or receipts or other evidence has been produced which would substantiate the claimed payments. Thus it is with good reason that respondent did not allow the amount of claimed drilling expenses represented by the checks made out to the National Bank of Detroit. The major portion of the drilling expenses and depreciation are shown in the form of journal entries on the books of the leases based upon several series of cashier's checks purchased by or for John at the National Bank of Detroit. The cashier's checks were all made payable to the order *113 of John and were negotiated or cashed at the National Bank of Detroit by or for John within a day or two of being purchased. Petitioners contend that John bought all the cashier's checks from personal funds, cashed the checks shortly thereafter, and took the cash to Oklahoma where it was paid over to either Gatton or Olsen for drilling or equipment. John claims that on occasion he took as much as $10,000 in cash to Oklahoma. This was done, so John says, because it was the custom in Oklahoma to pay in cash. Unfortunately petitioners have produced no receipts from Gatton and Olsen. Reilly testified at the trial of this case. According to Reilly, as part of the transaction in which John acquired the leases, Reilly agreed to "sit on" the leases. This meant that Reilly would observe the development work undertaken on a lease to ascertain if it was being done correctly, and, presumably, report to John. John agrees that Reilly assumed the duty to sit on the leases. Reilly sat on all the leases involved in the present matter. He testified that Gatton did not drill any of the wells he sat on, and that the majority of the wells were drilled by M. G. Jenson. During the years in issue Reilly *114 was a crude oil producer by occupation. He testified that he did not pay cash to persons doing work for him, and that he did not recall it being done in the oil business in the Bartlesville, Oklahoma, area. Also testifying at trial was M. G. Jenson, who drilled most of the wells on the leases during the years in issue. Jenson was always paid by check, and did not have knowledge of any custom to pay in cash. It is a matter of evidence that Jenson did not bring the wells he drilled to the production or utilization stage. However the books and records of the leases reveal payments by checks, substantial in amount and number, to such a variety of contractors and suppliers as to create the inference that the completion work was done by the parties listed in the books. John's contention that Gatton and Olsen required cash payments is further negated by the fact that the books of the Barnsdall lease show a sizable payment by check to Gatton, and over a 3-year period, regular payments by check to Olsen. Respondent explains as follows the numerous and in some instances, sizable 863 cashier's checks which allegedly indicate the payment of drilling expenses. Upon the receipt of checks *115 from investors, such checks would be taken to the National Bank of Detroit and there negotiated for a cashier's check drawn to John's favor. Within a few days, and after receipt of additional investors' checks, the first cashier's check and the additional investors' checks would be negotiated at the National Bank of Detroit for a new cashier's check of a larger amount, but again drawn to John's order. Within a day or two the second cashier's check would be deposited in the National Bank of Detroit account of the lease shares of which had been purchased by the investors' checks negotiated earlier. The books and the deposit slips of the particular lease would show that the amount of the investors' checks had been received on the day the second cashier's check was deposited, although the investors' checks themselves were marked by the National Bank of Detroit as having been negotiated several days earlier. This process would be repeated or carried forward with some variation on the theme until a number of cashier's checks had been purchased and renegotiated. Then the dates and amounts of the cashier's checks would be entered on the journal of the lease the shares of which had been purchased *116 by the investors whose checks had been negotiated to purchase the cashier's checks. The aggregate of the cashier's checks would be described as drilling expenses paid by John, credited to John's capital account and, finally, charged to machinery and equipment and drilling expenses. Thence the amounts of the cashier's checks found their way into petitioners' tax return via the partnership return filed for the particular lease. We have carefully examined the evidence which includes, ledgers for the leases, deposit slips for some lease accounts, copies of cashier's checks, checks written by investors, and checks drawn on the lease bank accounts. Particular attention has been given to the dates the various checks were drawn and dates they were negotiated, and to dates of entries on the books and records of the leases. This examination leads us to conclude that respondent's explanation of the cashier's checks is correct. This same examination also leads to the conclusion that some of the checks referred to above which were drawn on the lease accounts to the order of the Detroit National Bank were part of the scheme. A further reason for questioning the veracity of the claimed drilling *117 expenses is that the book entries ostensibly supporting them do not coordinate very well with the acquisition of and performance of work on the leases. The Osage lease was purchased on September 26, 1958, yet the books for that lease show payment of drilling expenses by cashier's checks beginning in March 1958. Similarly the Holland lease was acquired on March 14, 1959, although the books show that drilling expenses paid by cashier's check were incurred starting February 3, 1959. The last of the cashier's checks for Holland in 1959 was purchased on May 6, but John did not drill on Holland until May 21, 1959. On Reedy no drilling started until September 24, 1959, although all the cashier's checks ostensibly showing drilling expenses had been purchased by July 27. Drilling was not started on Barnsdall until February 6, 1959, whereas the books of the lease show that John allegedly spent $38,490 on drilling expenses as of January 23, 1959. While respondent in his determination for 1958, 1959, and 1960 allows some part of the claimed oil lease losses, he disallowed the losses in toto for 1961, 1964, and 1965. The evidence of record for 1961 is not materially different than that for 1958, *118 1959, and 1960. Accordingly we conclude that some deductible loss with respect to the oil leases for 1961 was incurred. Since the record is not sufficiently specific we are compelled to make an approximation. Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). Applying this axiom, we determine petitioners are entitled to a loss of $12,500 on John's oil lease interests in 1961. As for the years 1964 and 1965, there is not a shred of evidence in the record to support the claimed losses. Thus, with the exception of the adjustment here made for 1961, we conclude respondent has correctly determined the amount of losses properly allowable on account of John's oil lease holdings. On their returns for 1958, 1959, 1964, and 1965, petitioners took in the amounts of $2,618.87, $3,424.98, $1,950.28 and $2,162.72 respectively on account of expenses allegedly incurred by John in the business of exploring for oil and forming joint ventures. No income was ever reported by petitioners as having been realized from the alleged business. Petitioners have not demonstrated that John was in fact in the claimed trade or business, nor have they shown that the 864 alleged expenses were *119 in fact incurred. [4] It would not be surprising to find that John incurred expenses while dealing with the fractional interests in the leases. However to sustain a claimed deduction we must have evidence and not mere supposition. Thus we agree with respondent that petitioners are not entitled to the claimed business expenses. Before we take up the question of whether civil tax fraud exists for any of the years in issue we must dispose of some procedural matters concerning 1961. At the time of the trial of this matter, respondent submitted to the Court a motion to amend his answer with respect to 1961 and assert fraud instead of negligence. We took the motion under advisement. As a reason for granting his motion respondent states that: On the basis of facts which respondent has obtained since the filing of his original answer, it now appears that a part of the underpayment of the tax required to be shown in the petitioners income tax return for the taxable year 1961 is due to fraud, rather *120 than negligence as was determined in said statutory notice. Petitioners for their part resist the motion. They assert that respondent has not been diligent in the preparation of his case for 1961, and that they would be greatly prejudiced by the granting of the motion. On this issue we are in agreement with the petitioners and hereby deny respondent's motion to amend his answer for 1961 to assert fraud. This Court, under section 6214(a) [5] has jurisdiction to consider proposed increases in deficiencies and penalties anytime before the issuance of a final decision. Section 6214(a) does not give the respondent the right to amend his answer as a matter of law, rather the question is within the sound discretion of this Court. Commissioner v. Long's Estate, 304 F. 2d 136, 142-3 (C.A. 9, 1962); Commissioner v. Erie Forge Co., 167 F. 2d 71, 74, 76 (C.A. 3, 1948), affirming a Memorandum Opinion of this Court; cf. Commissioner v. Licavoli, 252 F. 2d 268, 272 (C.A. 6, 1958), affirming a Memorandum Opinion of this Court. Generally a motion to amend the answer must be timely, supported by a good reason, and if granted, not prejudicial to the opposing *121 party. Tax Court Rules of Practice, Rules 14(b), 17(a) and 19(a); Helvering v. Edison Securities Corporation, 78 F. 2d 85, 91 (C.A. 4, 1935).
To say that respondent failed to exercise diligence with respect to the question of fraud in 1961 is to understate the facts. Respondent had petitioners' year 1961 under investigation since 1962. At that time a revenue agent was shown *122 by John a receipt in support of sizable claimed drilling expenses. In a report made on June 26, 1967 the agent described the receipt as fictitious. The statutory notice covering 1961 was issued on April 11, 1968. By May 9, 1969, respondent had issued a statutory notice covering 1958, 1959, and 1960, in which fraud was asserted for each year. The nature of the evidence, and the putative sources of deficiencies for those years are not substantially different from those in 1961. It is not precisely clear from the record what respondent's later discovered facts are. However that may be, later discovered evidence, in our mind, refers to maters which remain covered in spite of a diligent investigation, and only later come to light. The concept, in fairness does not refer to matters which are not found because no one bothered to look, or because obvious leads were not followed. A lack of diligence is a sufficient reason to deny the motion to amend. Commissioner v. Long's Estate, supra; Selwyn Operating Corporation, 11 B.T.A. 593 (1928). The question of raising fraud by amended answer is particularly acute. Usually when 865 respondent raises a question for *123 the first time in the answer or amended answer, there is a price - he must assume the burden of proof. Rule 32, Tax Court Rules of Practice. In the case of fraud respondent already has the burden of proof and thus to that extent lacks incentive to be prompt in raising the issue. This same consideration applies here although respondent in the statutory notice sought to set aside the usual statute of limitations by asserting a 25 percent omission of income. Section 6501(e). [6] True, respondent has the burden of proving gross income was omitted. C. A. Reis, 1 T.C. 9 (1942), aff'd 142 F. 2d 900 (C.A. 6, 1944). But, this presents a different situation from fraud where respondent must show that "any part of the underpayment * * * of tax * * * is due to fraud," to overcome the statute of limitations. Sections 6501(c) and 6653(b). Consequently a different defense posture is required of a taxpayer. *124 Just how prejudicial it would be to grant respondent's motion is shown by the fact that respondent has in the present case failed to show a 25 percent omission from gross income and consequently the year 1961 is closed to assessment and collection. The putative omission from gross income for 1961 was the net amount of assessments received from investors in 1961. Since we have determined that no part of the assessments was income to John the statute of limitations has run for 1961. Section 6501 (a). [7]
To be considered now is the question of whether any part of the underpayment of tax for 1958, 1959 and 1960 is due to fraud. The question is doubly important to respondent. Unless there is a determination of fraud the statute of limitations will bar the assessment and collection of the deficiencies. Section 6501(c). [8] *125 As has been said many times this Court will not presume fraud, rather its existence must be established by clear and convincing evidence. The question is a factual one, to be determined upon a consideration of the whole record. Anson Beaver, 55 T.C. 85 (1972). The burden of proving this issue rests upon the respondent, [9] but again we emphasize he only need show that "any part" of the underpayment of tax was due to fraud. [10]
*126 Our evaluation of the whole record is to include an examination of John's background and conduct, the manner in which he pursued his business affairs, and the circumstances surrounding the preparation of the allegedly fraudulent returns. Foster v. Commissioner, 391 F. 2d 727, 733 (C.A. 4, 1968). Our consideration is not limited to respondent's affirmative evidence. Lucrana Pigman, 31 T.C. 356, 370 (1958). There are a number of factors here present which lead us to conclude respondent has shown that the returns for 1958, 1959 and 1960 were fraudulent. Petitioners took very substantial losses on their returns for 1958, 1959 and 1960. As our earlier discussion has indicated these losses were for the most part fictitious. John very simply admitted on the stand that a number of the checks written to Reilly and to the National Bank of 866 Dewey, and charged to drilling expenses, were in fact payments on the purchase of the leases. This was a blatant attempt to convert an obvious capital expenditure into a deduction. John went through an elaborate check purchase and repurchase scheme to create the basis for book entries indicating drilling expenses. It *127 cannot be concluded that the substantial fictitious losses had only some purpose internal to the leases vis-a-vis John and the investors. If there was no tax motive in creating the deductions, John would not have carried them to his personal tax return from the various partnership returns. The intent to fraudulently understate income can be evidenced by a consistent practice of claiming substantial nonexistent expenditures as deductions. M. Rea Gano, 19 B.T.A. 518, 533 (1930). John in his testimony has attempted to create the impression that the now deceased Walker was responsible for deciding what were deductible expenses for the leases. There is enough in the record for us to conclude that John was controlling the flow of information to Walker and that Walker was functioning under the direction of John. A self-serving claim that one was misled by the books and records he controlled will not serve to overcome strong evidence of fraud. See, Biggs v. Commissioner, 440 F. 2d 1, 6 (C.A. 6, 1971), aff'g a Memorandum Opinion of this Court, Webb v. Commissioner, 394 F. 2d 366, 379 (C.A. 5, 1968). John received substantial income in each of the *128 years 1958, 1959 and 1960 from the sale of fractional shares in the oil leases. Simple mathematics show the fractional shares were sold at a gain. The shares were conveyed by recorded assignments, and were covered by an operating agreement which referred to the investors as co-owners. Nothing in the record supports a conclusion that John was honestly mistaken or misinformed about the nature of the initial payments made by the investors. A consistent and substantial failure to report income over several years is highly persuasive evidence of an intent to defraud. Webb v. Commissioner, supra; Kurnick v. Commissioner, 232 F. 2d 678, 681 (C.A. 6, 1956). John's intelligence is demonstrated by his advanced education. Additionally, John has some prior experience in oil investing. Thus we conclude, John knew very much what he was about when he deducted the substantial oil lease losses, and failed to include the amounts received on the sale of the lease interests. We observe that respondent in the original notices asserted fraud only for those years which would be otherwise closed under both the general and extended statute of limitations. However, the deficiencies *129 for 1964 and 1965 are relatively small making the assertion of fraud in the present context difficult to sustain for those years. In any event, that respondent chose to assert fraud for some years in issue and not others does not alter our determination. Since we have determined that some part of the deficiencies in each of the years 1958, 1959 and 1960, is due to fraud, it follows that those years remain open for the assessment and collection of the deficiencies. Respondent, in the statutory notice for 1961, 1964, and 1965, asserted the addition to tax for negligence or intentional disregard of rules and regulations. Section 6653 (a). [11] The burden of proof with respect to this issue rests upon the petitioners. David Courtney, 28 T.C. 658, 699 (1957). As indicated earlier the statute of limitations has closed 1961. Petitioners have presented no evidence on this issue for 1964 and 1965, and so respondent's imposition of the penalty is sustained for those years. *130 Finally we consider the question of whether Betty Chanik is liable for any of the deficiencies here determined. Section 6013(e) provides: Sec. 6013. Joint Returns of Income Tax by Husband and Wife. * * * (e) Spouse Relieved of Liability in Certain Cases. - (1) In General. - Under regulations prescribed by the Secretary or delegate, if - 867 (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return. (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, *131 penalties, and other amounts) for such taxable year to the extent that such liability to such omission from gross income. The spouse seeking relief under section 6013(e) has the burden of showing she fits within the solicitude of the statute. Jerome J. Sonnenborn, 57 T.C. 373, 381-2 (1971)
There has been no showing that some part of the underpayment in any of the years 1958, 1959 and 1960 is due to fraud on the part of Betty. Accordingly she is not liable for the fraud penalties for those years. Sec. 6653(b). However, the determination of fraud as to John prevents the running of the statute of limitations, and Betty may be liable for the 1958, 1959 and 1960 deficiencies. Nathaniel M. Stone, 56 T.C. 213, 228 (1971). We do not think Betty can successfully claim she did not know of or had no reason to know of the omission from income in 1958, 1959 and 1960. She did a substantial amount of banking for the leases, and performed clerical duties. Additionally she attended some investors' meetings. The years 1964 and 1965 do not involve an omission of income. Thus, the relief of 6013(e) is not available to Betty for those years. In accordance with the *132 foregoing, Decisions will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
*. Plugging started and/or completed.↩
2. With the exception of the Osage lease the amounts received from investors for the fractional interests exceeded John's cost of the given lease, and in the case of Osage the difference was relatively small.↩
3. Robert Green Ingersoll, June, 1897.↩
4. Additionally, petitioners certainly have not shown that the expenses, if any, were not of an investigatory or starting-up nature. See Morton Frank, 20 T.C. 511↩ (1953).
5. SEC. 6214. DETERMINATIONS BY TAX COURT. (a) Jurisdiction as to Increase of Deficiency, Additional Amounts, or Additions to the Tax. - Except as provided by section 7463, the Tax Court shall have jurisdiction to redetermine the correct amount of the deficiency even if the amount so redetermined is greater than the amount of the deficiency, notice of which has been mailed to the taxpayer, and to determine whether any additional amount, or addition to the tax should be assessed, if claim therefor is asserted by the Secretary or his delegate at or before the hearing or a rehearing. The term hearing as used in the statute means the entire proceeding down through the Rule 50 determination. H. F. Campbell Co., 54 T.C. 1021 (1970), aff'd 443 F. 2d 965↩ (C.A. 8, 1971).
6. SEC. 6501(e). Substantial Omission of Items. - Except as otherwise provided in subsection (c) - (1) Income taxes. - In the case of any tax imposed by subtitle A - (A) General rule. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. * * *↩
7. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule. - Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period.↩
8. SEC. 6501(c). Exceptions. - (1) False return. - In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.↩
9. SEC. 7454. BURDEN OF PROOF IN FRAUD. FOUNDATION MANAGER, AND TRANSFEREE CASES. (a) Fraud. - In any proceeding involving the issue of whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary or his delegate. ↩
10. SEC. 6653. FAILURE TO PAY TAX. (b) Fraud. - If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.↩
11. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes. - If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud) there shall be added to the tax an amount equal to 5 percent of the underpayment.↩